UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF NEW YORK

-----------------------------------------------------------------x
                                                        :
KAREN WATERMAN,                                         :
                                                        :
                        Plaintiff,                      :  Civil No. 5:19-CV-514  [BKS/TWD]
                                                        :
        -against-                                       :  **COMPLAINT**
                                                        :
NIAGARA MOHAWK POWER CORP.                              :  **JURY TRIAL DEMANDED**
d/b/a NATIONAL GRID USA,                                :
                                                        :
                        Defendant.                      :
                                                        :
-----------------------------------------------------------------x

Plaintiff Karen Waterman ("Waterman"), by and through her attorneys, Cerasia & Del Rey-Cone LLP, for her Complaint against defendant Niagara Mohawk Power Corporation d/b/a National Grid USA ("National Grid"), alleges as follows:

## NATURE OF ACTION

1.      Waterman has been employed by National Grid for over 38 years.  She has been a trailblazer at National Grid: for more than 18 of those years, she has been a union-represented Chief Line Mechanic (one of the few females to hold this position at National Grid) and she is the only female Line Mechanic out of 80 employees in National Grid's Mohawk Valley Line Department.

2.      Waterman has been an outstanding employee and has received praise in the past from her supervisors about her value, job performance, work ethic and character.  Yet, despite her achievements, working in the male-dominated environment at National Grid has been nothing short of a struggle for Waterman, who has been subjected for years to a continuous pattern of unlawful and lewd conduct because of her gender and her complaints about that conduct.

3.      Along the way, Waterman has complained repeatedly to National Grid's management, Human Resources and Ethics Departments, and/or through National Grid's hotline about the continuous course of lewd, bullying and unlawful conduct toward her, but National Grid ignored her complaints and acquiesced in the pattern of unlawful conduct to which she has been subjected.  This conduct has caused Waterman to suffer significant emotional distress and the loss of income, as well as incur considerable medical expenses.

4.      Through Waterman's written and verbal complaints to National Grid, it was aware of the unprofessional, gender-based and retaliatory behavior of male employees toward her.  For instance, over several years, Waterman complained to management, the Human Resources and Ethics Departments, and/or through the National Grid hotline about male employees calling her "Crazy Cunt," employees placing posters on the wall suggesting that she is a lesbian, employees sabotaging her work and making false statements to management about her work, management making her undergo a psychological exam and holding her out of work for twenty-six (26) days based on false accusations and stereotypes, a male employee urinating in front of her and exposing his penis to her, employees placing graphic sexual photographs or images on their personal lockers in a public area, employees routinely placing a toy rat in her mailbox, employees removing tools from her truck, and employees playing "pranks" on her.  Most recently, Waterman has complained about being held out of work for twenty-five (25) days because of management's perception that she is mentally disabled, as well as a bag of "NUTS" that was left on her work truck shortly after she returned to work from that forced leave of absence.

5.      But, despite such knowledge for years of the continuing violations of Waterman's rights under the anti-discrimination laws, National Grid has turned a blind eye and/or paid lip service to its obligations under its policies and the law in order to protect, and thus enabled, certain

male employees as they have continued to harass and bully Waterman because of her gender, perceived mental disability and protected activity.

6.    Waterman brings this lawsuit against National Grid to obtain money damages and equitable relief for sexual harassment, gender discrimination, discrimination based on a perceived mental disability, and retaliation against her for complaining about discrimination, in violation of Title VII of the Civil Rights Act of 1964 ("Title VII") and/or the New York State Human Rights Law, N.Y. Executive Law § 290 *et seq.* ("SHRL"), as well as for subjecting her to intentional infliction of emotional distress.

## PARTIES

7.    Waterman is a citizen of the State of New York, residing in Madison, New York.

8.    National Grid is incorporated under the laws of the State of Delaware and has its principal place of business in Massachusetts.  It conducts business within this District, including maintaining facilities in Utica and New Hartford, where Waterman works.

9.    At all times material hereto, National Grid has been Waterman's employer within the meaning of Title VII and the SHRL.

## JURSIDICTION AND VENUE

10.    The causes of action which form the basis of this lawsuit arise under Title VII, the SHRL and the New York common law.

11.    This Court has jurisdiction over Waterman's Title VII claims pursuant to 28 U.S.C. § 1331, and the Court may exercise supplemental jurisdiction over Waterman's state law claims, pursuant to 28 U.S.C. § 1367.   This Court also has diversity jurisdiction over Waterman's state law claims, pursuant to 28 U.S.C. § 1332, given the parties' complete diversity of citizenship and the amount in controversy exceeds $75,000.

3

12. Venue is proper in this District under 28 U.S.C. § 1391(b) because a substantial part of the events or omissions giving rise to this action, including the unlawful employment practices and conduct set forth herein, occurred in this District.

## EXHAUSTION OF ADMINISTRATIVE PROCEDURES

13. On March 27, 2018, Waterman filed a Charge of Discrimination (the "Charge") against National Grid with the U.S. Equal Employment Opportunity Commission ("EEOC"). The EEOC did not acknowledge receipt of the Charge until September 25, 2018 and, on October 15, 2018, without contacting Waterman or her attorneys, obtaining any information from National Grid or investigating the Charge, the EEOC issued Waterman a Dismissal and Notice of Rights. Waterman is filing this lawsuit within ninety days of the EEOC's issuance of the Dismissal and Notice of Rights, given that the parties' attorneys entered into an agreement to toll the statute of limitations periods applicable to her claims, including the last day for filing her lawsuit under Title VII, up to and including April 30, 2019.

## FACTUAL ALLEGATIONS

14. Waterman began her employment with National Grid over 38 years ago. She has been a Chief Line Mechanic at National Grid for more than 18 of those years. She is one of the few females to hold this position at National Grid and she is the only female Line Mechanic out of 80 employees in National Grid's Mohawk Valley Line Department.

15. As a Chief Line Mechanic, Waterman oversees crews and generally works on power maintenance and restoration, energized circuits, troubleshooting and patrols and inspects transmission and distribution lines from the ground and through helicopter patrols.

16. Waterman has been an outstanding employee and has received praise from her supervisors about her value, job performance, work ethic and character. In fact, her current

supervisor, Joshua Lasher, gave her glowing praise in writing, stating the following about her in late-2016:

> Karen Waterman works directly for me at National Grid in the Utica Line Department and holds the position of Chief Line Mechanic A Hot Stick. This letter is regarding Karen's work ethic, character and leadership skills. Karen is my senior Foreman, who carries a pleather [sic] of knowledge that is essential to our Electrical Operations in the Mohawk Valley Region. She is very passionate towards the trade, our company, and customers. Karen takes pride in training our apprentice line mechanics in performing the work safe, and to National Grid's standards. She communicates very well with her crew members, Supervision, and the customers. Karen always addresses any question or concern about how a job is designed or executed. In my experience with Karen she always has her jobs laid out, hazards mitigated, and a detailed job brief. She is always on time for work, prepared, and ready for whatever work that comes her way. *I wish I had ten more linemen like Karen that have the same attitude, and integrity she possesses toward her every day duties as an employee at National Grid.*

17.    Waterman's former supervisor, Jason Palmer, had similar praise for her, including stating the following in writing in late-2016:

> . . . Karen is an extraordinary teacher and communicator. Her direct supervisors make it a point to cycle all new apprentice linemen through Karen's crew. Her understanding of electrical transmission and distribution systems is exceptional. The knowledge she possesses in electrical theory and construction techniques offers her an advantage in the field and ultimately facilitates trouble shooting techniques and decreases power outage times that are repaired by her crew. This knowledge is not bottled up. She takes the time to fully explain why we do things, which has helped mold several young Journeymen Linemen that have worked for her. Today, many of those individuals are ready for a Chief's position because of the solid foundation that Karen built for them.
>
> Finally, Karen is a caring and trusted employee. Her character is unmatched. She goes above and beyond for those in need and offers support to others even for those who wouldn't return the favor. I personally have been in the Trades business for over twenty years. During that time, there have only been a handful of colleagues that I would feel comfortable handing the keys to and Karen is one of those employees. She can be trusted with any job

assignment.  Karen is truly a great employee who makes every attempt to always do the right thing.

18.     Despite the fact that Waterman's supervisors have recognized her as "a great employee" with an impeccable "work ethic" and who is "trusted," National Grid has degraded and humiliated Waterman by condoning and participating in creating a discriminatory and retaliatory hostile work environment for her.

19.     Throughout her employment at National Grid, Waterman has been subjected to a sexually hostile environment that is the result of its male-dominated workforce and culture.  For example, in the 1990s, a former Line Mechanic used to call her "dyke" and "butch" and made comments that "anyone who has to squat to pee doesn't belong in this department" and that "you must be a dyke to be a woman and perform line work."  Her male co-workers also regularly kept Playboy and Maxim magazines and calendars of topless women in their work trucks.  In addition, a supervisor would often stare at her breasts when he spoke with her.  Waterman worked hard to overcome and succeed in this hostile environment, but, as explained below, the circumstances began to escalate in 2014, and the environment became much worse and intolerable for her.

20.     The continuous pattern of bullying and targeting Waterman because of her gender and her complaints of discrimination underlying this lawsuit started to intensify when National Grid reinstated Joseph Moore ("Moore") to the Line Department in 2014.  National Grid had terminated Moore for his unprofessional conduct of falsifying timesheets, but through the union grievance process, he was reinstated.  After Moore's reinstatement, he sought to undo the consequences of his own wrongdoing by blaming Waterman for his termination.  He also demonstrated violent propensities and Waterman has remained fearful of him.  She promptly told National Grid about her fears and the factual basis for them.  After his reinstatement, Moore and his cronies – including James "Doc" Halliday ("Halliday"), Mike Miller ("Miller"), Jason Lake

6

("Lake"), Robert Cardamone and Terry Anweiler – engaged in an orchestrated, harassing, bullying and retaliatory pattern of unlawful conduct toward Waterman, as described above and below.

21.    Over at least 3½ years, Waterman's male colleagues repeatedly referred to her at work as "Crazy Cunt" – or "CC" for short.  In March 2017, a Line Mechanic also asked her if she wants to go eat at "CiCi's," obviously referring to the vile name they have given her.  Waterman complained to National Grid several times about this conduct, but, to her knowledge, no remedial action was taken to end this conduct.

22.    Waterman complained to National Grid about the fact that someone posted at National Grid's facility a notice of a phony "Retirement Party" for her in 2014, displaying the "rainbow" that is associated with the LGBT community, since employees claim she must be a lesbian to work in a man's world.  (Exhibit A.)

23.    The male employees' offensive and boorish conduct also has included Moore placing graphic sexual photographs or images on his locker in the public area, including of a scantily-clad female with tight garments showing the shape of her vagina, (Exhibit B); Halliday displaying on his locker a handmade "wire man" with a large screw to depict his penis, (Exhibit C); and employees placing a toy rat in her mailbox to target her for complaining about them, (Exhibit D).

24.    Starting in 2014, Waterman regularly complained to National Grid about the unlawful and unprofessional conduct to which she has been subjected, including complaining to management and to Kellie Knickerbocker ("Knickerbocker") and others in the Human Resources and Ethics Department.  Despite Waterman's complaints starting in 2014, National Grid failed to take action to correct this unlawful and unprofessional behavior between 2014 and March 2018, when Waterman filed her Charge of Discrimination with the EEOC.

7

25.    In May 2015, Waterman's co-workers held a meeting which she attended – referred to as the "fuck Karen meeting" – during which Moore falsely told co-workers that Waterman was the worst and most unsafe employee on the line.  Moore also informed the employees at this meeting that if they did not take this position, then he would not represent them in disputes in his role as a union steward.

26.    Employees assigned to work with Waterman also began to sabotage her work, including unnecessarily delaying completion of projects.  In addition, her male co-workers would leave worksites without notice, would take extra-long breaks, would simply not report to worksites, would create unsafe working conditions for her, and/or would falsely report safety infractions by her.  This conduct happened continuously since 2015.

27.    On December 2, 2016, based on false accusations by Moore and others, in which they stated that Waterman was acting "crazy," National Grid management decided to hold her out of service and ordered her to go to the hospital for a mental and physical examination.  Yet, there was no basis for that extreme measure by management, and she was quickly cleared by medical professionals.  Nonetheless, National Grid held Waterman out of work for twenty-six (26) days, based on false allegations that were designed to bully and harass her because of her gender and complaints about unlawful gender-based conduct.  In addition, Corey Monk ("Monk"), a Superintendent at National Grid, told Waterman on the day that she was forced to leave work that "I hope you come back to us."  A few days later, at a scheduled morning meeting of National Grid supervisors and Waterman's co-workers, Monk informed everyone that Waterman was out of work "indefinitely" and that no one was to make contact with her.  Based on the timing of Monk's statements and National Grid's actions at that time, Waterman reasonably believed that her job was in jeopardy.

28.     National Grid would not have held Waterman out of work or made her go for a mental or psychological evaluation if she were a man or if she had not complained about gender-based harassment and bullying.  In addition, National Grid management held Waterman out of work because it perceived her to have a mental disability.  That decision was humiliating to Waterman, and caused her unnecessary and significant emotional distress, humiliation and embarrassment, as well as caused her to incur considerable medical expenses and lost wages, including overtime pay.

29.     While Waterman was out of work in December 2016, her male co-workers started calling her "Craz*ier* Cunt."  Moore and Halliday also began telling employees that Waterman "went crazy," was terminated from employment, that security had escorted her out of work and that employees should not speak with her.  National Grid was aware of this conduct, or at least should have been aware of it, but took no corrective action to stop it.

30.     Upon Waterman's return to work on December 28, 2016, National Grid only allowed her to carry over one week of vacation into 2017, and not the two weeks she had left over from 2016, which was contrary to its practice.  National Grid did not reimburse Waterman for that additional week of vacation for over four months, despite her repeated requests for her vacation pay.

31.     National Grid management also treated Waterman in a disparate manner in 2017. For example, on January 9, 2017, Waterman was working at a jobsite and dug into the ground without receiving a specific "Dig Safe" notice.  Waterman reasonably believed that she had the proper clearance to do so, given that she had requested such clearance the prior week.  Nonetheless, management wrongly determined that she did not have clearance to dig and suspended her without pay for one week and included a disciplinary letter in her otherwise spotless employment file.  Yet,

9

Waterman was aware of male Line Mechanics digging into the ground without a Dig Safe, but those employees were not disciplined.

32.     In early-2017, shortly after Waterman returned to work from her mandated leave of absence, Moore and other co-workers continued a campaign to get her fired.  For example, on or about January 4, 2017, Waterman gave work gloves to a contractor working on the house of a National Grid customer.  Without Waterman's knowledge, Miller took a videotape of Waterman doing so, and then he and Moore falsely informed National Grid management that Waterman gave the contractor the gloves, a volt meter and a box of unknown material.  Waterman, however, was able to produce the volt meter to management, thus showing that the allegations against her were false.  Management issued her a verbal counseling for giving the contractor the work gloves.

33.     In addition, after Waterman's return to work on December 28, 2016, management assigned fewer crew members to her jobs.  Waterman questioned management about this disparate treatment, and she also complained to Human Resources about such treatment.  National Grid did not provide her with a response.

34.     In early-2017, Waterman received confirmation that some of her male colleagues had embarked on an orchestrated campaign to sabotage her work and continually look for ways to bully and "get rid of" her because they did not want a woman in the workplace.  In fact, a co-worker told Waterman that her male co-workers had a "running competition" to see who can get her fired.  This explains why Waterman's spiteful male co-workers made false allegations about her work product and abandoned her on jobsites, and their conduct has resulted in unwarranted disciplinary action against her.  While the allegations lodged against Waterman concerning her work were baseless, there has been an unfounded reliance by management on "strength in numbers" when her male colleagues agree to lie about her alleged actions or decisions on a job

10

site, the male-dominated union refuses to help her and actually is against her, and then management credits the same workers who call her "Crazy Cunt" and have a documented employment record of lying (*e.g.*, Moore, Halliday and Miller).

35.    On March 22, 2017, Waterman met at a Dunkin' Donuts in Washington Mills, New York, with Kathleen Covatta ("Covatta"), who is the Manager Labor Relations – West, Knickerbocker and her union steward, Mike Shelby ("Shelby"), to discuss the conduct to which she had been subjected.  In discussing that treatment toward Waterman, Knickerbocker admitted that the conduct at issue was considered both "bullying and harassment."  In response, Shelby asked what National Grid would do, and Knickerbocker replied that she was going to report the situation to "a higher level."  Waterman suggested that National Grid interview the entire Mohawk Valley Line Department individually and without any union representative present, given that National Grid's prior interviews with her co-workers concerning the "Crazy Cunt"/"CC" nickname were conducted in the presence of the union business agent, James Card ("Card"), and Waterman believed that her co-workers were intimidated by the close friendship between Card and Moore.

36.    In late-May 2017, Waterman's supervisors issued her the first negative performance review she had received at National Grid.  That review seized upon the harassment to which she had been subjected and the false allegations from co-workers about the quality of her work, falsely and inaccurately stated areas where she needed to improve, and stated that she had "lost focus" on her job.  Of course, that review did not take into account or acknowledge the hostile environment to which Waterman had been subjected over the years, which clearly made it difficult for her to do her job.  Waterman even asked her supervisors what National Grid was doing about the "continuing harassment" and the "use of the 'CC'" nickname, but she received no response.

That performance review was issued to her because of her gender and in retaliation for her complaints.

37.    In early-July 2017, Waterman submitted a written complaint to Knickerbocker. Waterman's complaint set forth a detailed summary of the conduct that she was forced to endure at National Grid over the years, including the facts set forth above.

38.    In mid-August 2017, Thomas Cammuso ("Cammuso") from the Human Resources Department questioned Waterman and other employees about an alleged "safety stop" to any work being performed in connection with a work trip that she had from May 19 through May 21, 2017, in Tully, New York.  Waterman told him that she was unaware of any unsafe work conditions or employees claiming any such conditions.  As it turned out, Waterman learned that employees – who she believes to be Halliday, Miller and Lake – had sent the Human Resources or Ethics Department a photograph of a line worker "hanging out of a bucket" and the words "this is Karen Waterman" were written on the back of the photograph.  This was yet another effort by Waterman's male co-workers to fabricate a story in an effort to get her fired.

39.    After Waterman met with Cammuso in August 2017, she sent him an email and a copy of her July 2017 complaint to Knickerbocker, so that he was aware of her complaint of sexual harassment and to let him know that she was not the only female employee in the Utica area who had been subjected to sexual harassment at work.  Cammuso, however, emailed Waterman to let her know that, since he was not part of her previous complaint, he could not help her and referred her to Knickerbocker.

40.    On August 29, 2017, Waterman met with Covatta and Judy Dunn about her written complaints in July 2017.  At that meeting, Waterman discussed her complaints and her receipt of a negative performance review, which was unwarranted.  Covatta told Waterman that National

12

Grid was only interested in discussing pages 4 and 5 of that written complaint letter, erroneously believing that it had addressed the complaints on the prior pages. Waterman objected to that position, stating that she did not believe National Grid had addressed or resolved her other complaints and that those complaints were ongoing.

41.    Waterman also learned that Cammuso went to the Utica facility on September 12, 2017, to interview a female employee about a complaint of sexual harassment toward that employee. Cammuso did not speak with Waterman about the work environment or her own complaints of sexual harassment at work. Once again, National Grid had the opportunity to address Waterman's concerns and complaints at that time, but chose not to do so.

42.    On October 27, 2017, Waterman informed Covatta that employees had told her that Moore and Halliday were spreading malicious rumors about her. Waterman gave Covatta the names of the employees with knowledge of Moore and Halliday's conduct so that Covatta could interview them to gather information. Waterman does not know if Covatta ever contacted all of those individuals.

43.    On November 8, 2017, Moore urinated in front of Waterman on a job and exposed his penis to her. Waterman informed Monk about Moore's conduct, but National Grid did not discipline Moore. Waterman is unaware of Human Resources getting involved to address Moore's conduct, and does not know if Monk reported it to Human Resources. Thereafter, Waterman's male co-workers continued to state that they wanted to get her fired so that they can do what they want to do at work. Waterman has complained in the past about such statements, but National Grid failed to take action to stop this conduct.

44.    Waterman submitted a written complaint to Knickerbocker on November 18, 2017, in which she provided a detailed summary of the harassment, bullying, discrimination and

13

retaliation that she had endured since her July 2017 complaint, including the conduct described above.

45.     Covatta and Knickerbocker allegedly investigated some of Waterman's complaints, but, at a meeting on November 21, 2017, they suggested to Waterman that she consider a "change of scenery" (*i.e.*, changing her work location) as "a resolution" of the problems she experienced with certain male co-workers. Waterman informed them that this was "unacceptable" to her. That suggested "resolution" was appalling and demonstrated to Waterman, once again, that National Grid condoned the outrageous and unlawful behavior to which she was and had been subjected. Instead of taking corrective action against the wrongdoers, as is required under the controlling law and National Grid's policies, Covatta and Knickerbocker suggested that Waterman transfer to a new location, where she would make less money in overtime pay and work an undesirable shift. That amounted to punishing and retaliating against the victim, and not correcting the unlawful conduct.

46.     Because the instigators are union leaders, the union has not adequately represented Waterman or has refused to help her. While National Grid may not have complete control over union affairs, it certainly has control over its union-represented employees and management's investigation of purported rules or safety infractions. Thus, when National Grid has continually credited the stories of the same individuals who have engaged in the gender-based harassment, bullying and retaliation against Waterman, National Grid is at least liable based on the "cat's paw" theory of liability under Title VII and the SHRL.

47.     It is abundantly clear that, despite objective evidence supporting Waterman's complaints, including, for example, witnesses who have heard males refer to her as "Crazy Cunt" and Knickerbocker's admission that Waterman has been subjected to "bullying and harassment,"

14

National Grid turned a blind eye to the conduct and, shockingly, sought to turn the tables on Waterman. Whether it is the result of National Grid condoning the harassing conduct, simply not being sensitive to the male-dominated and boorish environment to which Waterman has been subjected continuously for several years, incompetent investigations, or refusing to take on union stewards such as Moore and his posse, the result is the same: National Grid has continuously condoned or ignored blatant sexism, harassment and retaliation against Waterman since at least 2014, and thus is vicariously liable for that conduct.

48. As a result of National Grid's inaction in response to Waterman's numerous complaints, in early-2018, she had no choice but to retain her current attorneys to contact National Grid's Chief Executive Officer and its General Counsel, and then file her EEOC Charge on March 27, 2018. Thereafter, it appears that, for the first time, National Grid finally started to take Waterman's complaints seriously. For example, Halliday suddenly was moved to another work location. Waterman, however, does not know the reasons for that move, or whether National Grid took any disciplinary action against Halliday for his unlawful conduct or against any other employees who have engaged in unlawful conduct toward her.

49. Since filing her EEOC charge, however, Waterman has experienced additional retaliation. For instance, on or about September 16, 2018, Waterman attended a grievance meeting with Cammuso, the union and management about her January 2017 suspension with respect to the Dig Safe issue. Waterman requested that, consistent with National Grid's practice, the disciplinary notice associated with that discipline be removed from her file within one year. National Grid has not removed that disciplinary letter to date. She also subsequently informed National Grid that she was aware of several male co-workers who dug the ground on Dyke Road in Schuyler, New York, without having Dig Safe clearance, but that National Grid did not discipline those

15

employees.  Once again, this demonstrated the disparate treatment toward Waterman because of her gender and prior protected activity.

50.    As another example of discrimination and retaliation, National Grid also pulled Waterman out of service on January 11, 2019, based on what she understands was management's erroneous and discriminatory belief that she was not mentally fit to work.  National Grid required Waterman to meet with a counselor through its Employee Assistance Program ("EAP") before being able to return to work.  Waterman did so, and the EAP counselor cleared her to return to work without any restrictions.  Waterman was forced to remain out of work for twenty-five (25) days, as she did not return to work until February 5, 2019.

51.    National Grid could not provide Waterman with any reason for holding her out of work – let alone a justifiable reason for doing so – and it did not record her absence as a disciplinary action.  National Grid's decision to hold Waterman out of work was, once again, based on her gender, in retaliation for her protected activity, and was based on management's erroneous and discriminatory perception that she has or had a mental disability.

52.    The decision to hold Waterman out of work between January 11 and February 5, 2019 was humiliating to her, and has caused her unnecessary and significant emotional distress, humiliation and embarrassment, as well as caused her to incur medical expenses and the loss of overtime pay.

53.    Upon information and belief, Waterman's co-workers received information that led them to believe that National Grid held her of out service because management believed that she was not mentally fit to work.  As a result, on February 22, 2019, Waterman discovered a bag of Planter's "NUTS & CHOCOLATE" trail mix in the back of her work truck, but the "& CHOCOLATE" was redacted from that bag, so that it just read "NUTS" on the bag.  A true and

correct copy of that bag of NUTS is attached hereto as Exhibit E.  Upon information and belief, one or more of Waterman's co-workers left the bag of NUTS in her truck to harass, bully and torment her for being held out of work because of management's erroneous, stereotypical and discriminatory belief that she was or is "nuts" or has a mental disability and her gender.

54.    On February 22, 2019, Waterman promptly complained by email to Cammuso at National Grid about the bag of NUTS left in her truck, stating:

> This morning I found this bag of "Nuts" on the back of my truck.  As you can see, the words on the bag were crossed out to only show the word "Nuts".  I do not know who did this but it is offensive and creates a hostile environment for me. Unfortunately, this continues to be part of the harassment and retaliation that I have been experiencing for many years at National Grid. This type of conduct makes my work environment intolerable, and no employee should have to endure this treatment. I am requesting that National Grid promptly investigate this incident. Please let me know if you have any questions.

55.    Cammuso informed Waterman that Monk would "look into the matter however possible," but National Grid did not properly investigate that incident or take appropriate corrective action in response to it.

56.    The inexplicable conduct described above, which is egregious and has been wholly ignored and condoned by National Grid for many years, demonstrates a willful and reckless disregard for Waterman's rights, and has caused and will continue to cause Waterman humiliation, embarrassment, pain and suffering, as well as damage to her reputation and career.  She also has suffered lost wages and benefits, and she has legitimate concerns that she will continue to do so in the future.

17

## FIRST CAUSE OF ACTION
### (Sexual Harassment Under Title VII)

57.    Waterman incorporates herein by reference paragraphs 1 through 56, as if set forth herein in their entirety.

58.    The continuous pattern of unwelcomed and offensive conduct by Waterman's co-workers over the years, as set forth above, is a violation of Title VII.

59.    National Grid was aware or should have been aware of the conduct alleged herein, but failed to take appropriate action in response thereto, and thus is liable under Title VII for the unlawful and inappropriate conduct toward Waterman.

60.    As a direct and proximate result of National Grid's continuous violations of Title VII, Waterman has sustained the injuries, damages and losses set forth herein and has incurred attorneys' fees and costs.

61.    National Grid's conduct was willful, wanton and demonstrated a conscious disregard for Waterman's rights under Title VII, and warrants the imposition of punitive damages.

62.    Waterman is now suffering and will continue to suffer irreparable injury and monetary damages as a result of National Grid's unlawful conduct unless and until this Court grants the relief requested herein.

## SECOND CAUSE OF ACTION
### (Gender Discrimination Under Title VII)

63.    Waterman incorporates herein by reference paragraphs 1 through 56, as if set forth herein in their entirety.

64.    As described above, National Grid continuously treated Waterman in a disparate manner because of her gender, including, but not limited to, with respect to her work assignments,

discipline, forcing her to undergo a mental and physical examination and take a leave of absence, issuing her a negative performance review, and isolating and ignoring her.

65.    As a direct and proximate result of National Grid's continuous violations of Title VII, Waterman has sustained the injuries, damages and losses set forth herein and has incurred attorneys' fees and costs.

66.    National Grid's conduct was willful, wanton and demonstrated a conscious disregard for Waterman's rights under Title VII, and warrants the imposition of punitive damages.

67.    Waterman is now suffering and will continue to suffer irreparable injury and monetary damages as a result of National Grid's unlawful conduct unless and until this Court grants the relief requested herein.

### THIRD CAUSE OF ACTION
### (Retaliation Under Title VII)

68.    Waterman incorporates herein by reference paragraphs 1 through 56, as if set forth herein in their entirety.

69.    As described above, National Grid and its employees continuously have retaliated against Waterman and created a retaliatory hostile environment for her because of her complaints about unlawful conduct.

70.    As a direct and proximate result of National Grid's continuous violations of Title VII, Waterman has sustained the injuries, damages and losses set forth herein and has incurred attorneys' fees and costs.

71.    National Grid's conduct was willful, wanton and demonstrated a conscious disregard for Waterman's rights under Title VII, and warrants the imposition of punitive damages.

19

72.     Waterman is now suffering and will continue to suffer irreparable injury and monetary damages as a result of National Grid's unlawful conduct unless and until this Court grants the relief requested herein.

## FOURTH CAUSE OF ACTION
### (Sexual Harassment Under the SHRL)

73.     Waterman incorporates herein by reference paragraphs 1 through 56, as if set forth herein in their entirety.

74.     The continuous pattern of unwelcomed and offensive conduct by Waterman's co-workers over the years, as set forth above, is a violation of the SHRL.

75.     National Grid was aware or should have been aware of the conduct alleged herein, but failed to take appropriate action in response thereto, and thus is liable under the SHRL for the unlawful and inappropriate conduct toward Waterman.

76.     As a direct and proximate result of National Grid's continuous violations of the SHRL, Waterman has sustained the injuries, damages and losses set forth herein and has incurred attorneys' fees and costs.

77.     Waterman is now suffering and will continue to suffer irreparable injury and monetary damages as a result of National Grid's unlawful conduct unless and until this Court grants the relief requested herein.

## FIFTH CAUSE OF ACTION
### (Gender Discrimination Under the SHRL)

78.     Waterman incorporates herein by reference paragraphs 1 through 56, as if set forth herein in their entirety.

79.     As described above, National Grid has continuously treated Waterman in a disparate manner because of her gender, including, but not limited to, with respect to her work

20

assignments, discipline, forcing her to undergo a mental and physical examination and take a leave of absence, issuing her a negative performance review, holding her out of work, and isolating and ignoring her.

80.     As a direct and proximate result of National Grid's continuous violations of the SHRL, Waterman has sustained the injuries, damages and losses set forth herein and has incurred attorneys' fees and costs.

81.     Waterman is now suffering and will continue to suffer irreparable injury and monetary damages as a result of National Grid's unlawful conduct unless and until this Court grants the relief requested herein.

**SIXTH CAUSE OF ACTION**
**(Retaliation Under the SHRL)**

82.     Waterman incorporates herein by reference paragraphs 1 through 56, as if set forth herein in their entirety.

83.     As described above, National Grid and its employees continuously have retaliated against Waterman and created a retaliatory hostile environment for her because of her complaints about unlawful conduct.

84.     As a direct and proximate result of National Grid's continuous violations of the SHRL, Waterman has sustained the injuries, damages and losses set forth herein and has incurred attorneys' fees and costs.

85.     Waterman is now suffering and will continue to suffer irreparable injury and monetary damages as a result of National Grid's unlawful conduct unless and until this Court grants the relief requested herein.

**SEVENTH CAUSE OF ACTION**
**(Perceived Disability Discrimination Under the SHRL)**

86.     Waterman incorporates herein by reference paragraphs 1 through 56, as if set forth herein in their entirety.

87.     As described above, National Grid has continuously perceived Waterman to have a mental disability, including, for example, when it forced her to undergo a mental and physical examination and take a leave of absence in December 2016 and held her out of work again in January 2019.

88.     As a direct and proximate result of National Grid's continuous violations of the SHRL, Waterman has sustained the injuries, damages and losses set forth herein and has incurred attorneys' fees and costs.

89.     Waterman is now suffering and will continue to suffer irreparable injury and monetary damages as a result of National Grid's unlawful conduct unless and until this Court grants the relief requested her.

**EIGHTH CAUSE OF ACTION**
**(Harassment Based on Perceived Disability Under the SHRL)**

90.     Waterman incorporates herein by reference paragraphs 1 through 56, as if set forth herein in their entirety.

91.     As described above, Waterman has been subjected to a hostile work environment because of management and her co-workers' perception that she has a mental disability, including, for example, when National Grid management held her out of service in December 2016 and again in January 2019, and the conduct of her co-workers' toward her after she returned to work from each of those forced leaves.

22

92. As a direct and proximate result of National Grid's continuous violations of the SHRL, Waterman has sustained the injuries, damages and losses set forth herein and has incurred attorneys' fees and costs.

### NINTH CAUSE OF ACTION
### (Intentional Infliction of Emotional Distress)

93. Waterman incorporates herein by reference paragraphs 1 through 56, as if set forth herein in their entirety.

94. National Grid's acquiescence in and condonation of the continuous pattern of harassing, discriminatory and retaliatory conduct toward Waterman over the years, as described above, is and was extreme and outrageous conduct.

95. National Grid's conduct is and was intentional in causing and producing the emotional distress suffered by Waterman, and it has acted in deliberate disregard of a high probability that emotional distress would occur or it was substantially certain that such harm would occur.

96. National Grid's conduct has caused Waterman to suffer severe emotional distress that no reasonable person should be expected to endure.

97. National Grid is vicariously liable for the unlawful and inappropriate conduct by its employees toward Waterman.

98. National Grid has acted with actual malice and/or with a wanton and willful disregard and the imposition of punitive damages is warranted.

99. As a direct and proximate result of National Grid's tortuous conduct, Waterman has suffered the injuries, damages and losses set forth herein, including severe emotional distress, and continues to do so.

100.    Waterman is now suffering and will continue to suffer irreparable injuries and monetary damages as a result of National Grid's intentional infliction of emotional distress unless and until the Court grants the relief requested herein.

## PRAYER FOR RELIEF

WHEREFORE, Waterman prays that this Court enter judgment in her favor and against National Grid, and grant to her the following relief:

A.    A declaratory judgment that the actions, conduct and practices of National Grid complained of herein violate Title VII and/or the SHRL;

B.    A declaratory judgment that the actions, conduct and practices of National Grid complained of herein constitute intentional infliction of emotional distress;

C.    An order restraining National Grid from engaging in unlawful conduct toward Waterman, including an order directing National Grid to take such affirmative action as is necessary to ensure that the effects of its unlawful employment practices and conduct are eliminated and do not continue to affect Waterman's employment or personal life;

D.    An award for all economic damages to be determined at trial, plus pre-judgment interest, to compensate Waterman for the unlawful conduct, including back pay, unreimbursed medical expenses and lost benefits;

E.    An award for all compensatory damages to be determined at trial, plus pre-judgment interest, to compensate Waterman for any future pecuniary losses, and her emotional distress, pain, suffering, inconvenience, mental anguish, stress, anxiety, humiliation, embarrassment, loss of enjoyment of life and other nonpecuniary losses as allowable;

F.    An award to Waterman against National Grid for punitive damages under Title VII and with respect to her intentional infliction of emotional distress claim;

G.    An award to Waterman for the costs incurred in this lawsuit, together with reasonable attorneys' fees; and

H.    An award to Waterman such other and further relief as this Court deems appropriate.

## JURY DEMAND

Waterman demands a trial by jury on all issues of fact, her claims and damages herein.

Dated:  New York, New York
        April 30, 2019

CERASIA & DEL REY-CONE LLP

By  s/ Edward Cerasia II
        Edward Cerasia II
        Attorney Roll #507475
    150 Broadway, Suite 1517
    New York, New York 10038
    646.525.4231

    Attorneys for Plaintiff
    *Karen Waterman*

25